UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SYLVAN MARTIN,

                              Petitioner,

          – against –

JOSEPH T. SMITH, SUPERINTENDENT,

                              Respondent.
------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ FEB 0 1 2013

BROOKLYN OFFICE

**MEMORANDUM & ORDER**

09-CV-5515 (SLT)

**TOWNES, United States District Judge:**

On November 22, 2002, <u>pro se</u> petitioner Silvan Martin was convicted in the Supreme

Court of the State of New York, Kings County, of second degree murder and second degree

menacing.  He now petitions this Court for a writ of <u>habeas corpus</u> pursuant to 28 U.S.C. § 2254.

For the reasons set forth below, his petition is denied.

## I.       BACKGROUND

In the early-morning hours of June 3, 2001, Corey Phillip was shot multiple times during

an incident outside of 2109 Regent Place in Brooklyn, New York.  (Tr. 131).  Hozel Charles,

who knew Martin and Phillip, testified that he saw Martin standing over Phillip and shooting as

Phillip was shouting.  (Tr. 331).  Phillip later died of his wounds.  Several weeks later, in front of

1593 Prospect Place in Brooklyn, New York, Martin pointed a gun at Garth Wilson and

threatened to "hit" Wilson "like Corey."  (Tr. 241, 243).  Martin was charged with and convicted

of Murder in the Second Degree, under N.Y. Penal Law § 125.25[1], and Menacing in the

Second Degree, under N.Y. Penal Law § 120.14[1].



## A.   Trial and Verdict

The trial commenced on November 13, 2002, before Justice Abraham Gerges, during which about a dozen witnesses testified for the prosecution. The defense called one witness and Martin did not testify.

### 1.   Arrest Photographs

On November 14, 2002, Justice Gerges heard argument regarding the admission of photographs of Martin from the day of his arrest. (Tr. 175-78). Defense counsel argued that because identification was not at issue – witnesses recognized Martin because they knew him – "really what the People are putting it in for [is] to show . . . he looked like a bad guy in January, 2002, and he tried to alter his appearance today so that the jury will be thinking he's a nice looking guy." (Tr. 177-78). The court denied the request to exclude the photographs. (Tr. 178).

### 2.   Juror Issue

On November 19, 2002, Justice Gerges announced that he had been informed that "one of the jurors feels intimidated by family of the defendant when they meet them in the elevator, et cetera." (Tr. 458). Alternate Juror Number Four, a correction officer, was brought into the courtroom alone and related the following information:

> ALT. JUROR FOUR:  I have been told by at least three jurors, all three women, that maybe defendant's people is out there, . . . after we were dismissed standing there, just watching them, leering at them, and in one case, juror number ten was in the elevator, and one wom[a]n said to another, but loud enough for her to hear, that she's one of the jurors. . . . It's another one, juror seven, who is like really scared, and I rode home on the train with her . . . because she was really scared because they were out there waiting. . . . She was the last one to come in today. She was really scared last night, petrified.

(Tr. 463-64). Justice Gerges directed Alternate Juror Number Four to leave the courtroom and called in Juror Number Seven for questioning:

2

| | |
|---|---|
| THE COURT: | I just wanted to know if you wish to say anything to the Court . . . . |
| JUROR SEVEN: | I'm sorry.  Just the fact that, um, before this case or anything happened, I lived a normal everyday life, and now it's just like, crazy. |
| THE COURT: | In what respect, ma'am? |
| JUROR SEVEN: | Just, I don't know if I could do this.  I don't know.  It's too much. |
| THE COURT: | Is it because you are frightened, ma'am? |
| JUROR SEVEN: | Yeah, I am. |
| THE COURT: | Does that have anything to do with . . . the family of the defendant? |
| JUROR SEVEN: | Somewhat. |
| THE COURT: | Okay.  Would you . . . be more comfortable . . . if I was to arrange transportation for everybody? . . . And [with] that in mind, can you be a fair in impartial juror? |
| JUROR SEVEN: | Yes, I'll try.  I'll try my best. |

(Tr. 466-67).  Justice Gerges then spoke with Juror Number Ten and Juror Number Five,

separately, each of whom described some contact with Martin's family members, but indicated

they were not fearful, would be comfortable having transportation home, and could be fair and

impartial.  (Tr. 468, 470).  Summoned for further questioning, Juror Number Seven affirmed that

she would feel more comfortable with car service home and having lunch brought in – and she

stated: "Yes . . . I can be fair." (Tr. 473).  Justice Gerges then called in and interviewed the rest

of the jurors individually.  (Tr. 478-96).  Most indicated they had heard discussion about the

issue from other jurors, but each stated he or she could be fair and impartial going forward.

After hearing argument from both counsel, Justice Gerges denied Martin's application for a

mistrial.  (Tr. 501).  He then brought in the jurors and instructed them not to speculate on the

3

reasons for the transportation and in-house lunch, that the case was to be decided on the evidence presented in court, and they should bring any further concerns to the court without discussing it with other jurors. (Tr. 504).

On November 20, 2002, defense counsel renewed his application for a mistrial, arguing that the measures undertaken by the court to assuage discomfort "corroborates the jurors' own belief that they have something to be afraid of concerning this defendant or his family and I don't see how that prejudice can be undone." (Tr. at 580). The court again denied the application. (Tr. 581). Defense counsel then requested that the court replace only Juror Number Seven because "although her final answer said yes," she could be fair, she was initially "equivocal." (Tr. 583). The court also denied this application. Having reviewed Juror Number Seven's responses on the record, the court determined that based on the way the juror spoke, the tone of her voice, and her demeanor, she could be fair and impartial. (Tr. 623).

On November 22, 2002, the jury returned a verdict, convicting Martin of second degree murder and second degree menacing. (Tr. 755).

**B.     Post-Trial 330.30 Motion and Sentencing**

On December 3, 2002, Martin moved pursuant to CPL § 330.30 to set aside the verdict and for a hearing "as to improper juror conduct or discussions prior to the deliberation process." (Resp. Appx. A-46). Defense counsel stated in his affirmation that several days after the verdict, he "received a telephone call from alternate juror number 2," who "indicated that she believed that several of the jurors had improperly discussed their feelings and concerns involving the trial prior to the commencement of the deliberation process." (Resp. Appx. A-49-50). According to that woman's affidavit, the discussions concerned the fears regarding Martin's family expressed by juror number seven and comments from alternate juror number four, some of which took place after the court interviews and instructions to the jury. (Resp. Appx. A-51-52). The People

4

opposed the motion, arguing that the affidavit merely reiterated information already investigated at trial and that "defense counsel seeks to relitigate the issue without bringing any new evidence." (Resp. Appx. A-54).

On December 19, 2002, Justice Gerges heard argument on the motion. Defense counsel conceded that "I don't have evidence to put forth in my affidavit or motion papers to indicate if there was actual impact that I can speak of," but argued that he had a "good faith basis" to contact the other jurors, make a record of their responses, and hold a hearing on the issue. (S. 5). The court denied the motion for a hearing in light of the hearing that took place at trial. (S. 6). The court thereupon sentenced Martin to concurrent prison terms of twenty-five years to life on the murder conviction and one year on the menacing conviction. (S. 20).

### C.    Direct Appeal

On the day of sentencing, Martin's trial attorney prepared a notice of appeal as he had promised his client, but failed to address the envelopes properly. On June 3, 2004, unaware that a notice of appeal had not been properly filed on Martin's behalf, defense counsel attempted to file a brief, but the appeal was rejected by the Appellate Division, Second Department (the "Appellate Division"). On June 7, 2004, defense counsel filed a motion to extend the time to make an appeal and to file a late notice pursuant to CPL § 460.30. On July 1, 2004, the Appellate Division denied the motion. Martin thereafter retained a new attorney who, on August 9, 2004, filed a writ of error coram nobis, alleging ineffective assistance of counsel for failure to secure Martin's right to appeal. The People did not oppose the application, but the Appellate Division denied the motion, construing it as a renewed motion to extend his time to take an appeal. On January 5, 2005, the New York Court of Appeals dismissed Martin's application for leave to appeal. People v. Martin, 4 N.Y.3d 765 (N.Y. 2005).

**D.    2005 Habeas Petition**

On December 20, 2005, Martin filed a petition in this Court for a writ of habeas corpus ("2005 Petition"), claiming ineffective assistance of counsel for failure to file a notice of appeal. Martin v. Smith, 05-cv-5956 (DGT) ("Martin I"). Respondent filed a response agreeing with Martin's petition and on November 30, 2006, Judge David G. Trager granted a conditional writ, ordering that Martin "be permitted to initiate and prosecute a direct appeal from his conviction within a reasonable period of time." (Martin I, Docket No. 5 at 2).

**E.    Subsequent State Court Proceedings**

Following Judge Trager's decision, the Appellate Division granted Martin's motion to reargue for an extension. Martin's appellate counsel perfected Martin's direct appeal, arguing that (1) the trial court improperly refused to declare a mistrial after jurors indicated fear of Martin's family and supporters; (2) the trial court's denial of Martin's post-trial motion for a hearing was an abuse of discretion; (3) the trial court improperly admitted Martin's arrest photograph; (4) the prosecutor made improper comments during summation; and (5) the guilty verdict was against the weight of the evidence.

On September 9, 2008, the Appellate Division affirmed the judgment of conviction, finding that (1) the trial court properly denied Martin's motions for a mistrial and to set aside the verdict for alleged juror misconduct; (2) although there was no relevant purpose for admitting the photograph, the error was harmless; (3) the prosecutor's challenged summation remarks were permissible or, in any event, harmless; and (4) the verdict was not against the weight of the evidence. People v. Martin, 54 A.D.3d 776, 776-78 (2d Dep't 2008). On November 28, 2008, the New York Court of Appeals denied leave to appeal the decision. People v. Martin, 11 N.Y.3d 856 (N.Y. 2008). Accordingly, Martin's judgment of conviction became final 90 days

6

later, on February 26, 2009. See 28 U.S.C. § 2244(d)(1)(A); Warren v. Garvin, 219 F.3d 111, 112 (2d Cir. 2000) (conviction final at expiration of time to petition for certiorari in the United States Supreme Court). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Martin had until February 26, 2010, a one-year period, to petition this Court for a writ of habeas corpus with respect to his judgment of conviction, see 28 U.S.C. § 2244(d)(1).

**F.    2009 Habeas Petition**

In his timely instant habeas petition ("2009 Petition"), filed December 11, 2009, Martin has reasserted each of the grounds he raised on direct appeal in state court. (2009 Petition Ex. 1).[1]  Respondent opposes the petition. (Docket No. 8 ("Resp.")).

**II.    DISCUSSION**

**A.    Procedural Default**

As a preliminary matter, a claim resolved by a state court on independent and adequate state procedural grounds is generally not subject to habeas review by a federal court. See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989). Moreover, when the last reasoned opinion on a particular claim explicitly applies a state procedural default, the federal court "will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Still, a federal court may review such a claim "if the petitioner can demonstrate 'cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of

---

[1]    On November 18, 2010, this Court denied Martin's request to amend the 2009 Petition to add a claim for ineffective assistance of counsel, finding that the claim was already remedied as a result of his 2005 Petition. (Docket No. 11).

7

justice.'" Gardner v. Fisher, 556 F. Supp. 2d 183, 193 (E.D.N.Y.2008) (quoting Coleman, 501 U.S. at 750).

**B.    Standard of Review**

Under AEDPA, a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law if the state court applies a rule that contradicts governing Supreme Court precedent or the state court confronts a set of facts that is materially indistinguishable from a Supreme Court decision and arrives at a different result. Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision is an "unreasonable application" of clearly established federal law if the state court's application is "objectively unreasonable." Id. at 409. An erroneous application of federal law is not necessarily an unreasonable one. Id. at 410-11. Instead, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000) (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Although a federal court may also grant a habeas writ if a state court decision on the merits "was based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), such factual determinations are "presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence," § 2254(e)(1).

Additionally, the Court is mindful that "[a] document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent

8

standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007)

(internal citations and quotation marks omitted). The same standard applies to pro se petitions

for federal habeas relief. See Chang v. United States, 250 F.3d 79, 86 n.2 (2d Cir. 2001);

Charles v. Fischer, 516 F. Supp. 2d 210, 215 (E.D.N.Y. 2007).

### C.    Martin's Claims

#### 1.    Juror Misconduct and Fear

Martin argues that the trial court should have granted his request for a mistrial after

learning that at least one juror had expressed fear to other jurors. (Resp. Ex. A, Martin Appellate

Brief, dated Mar. 19, 2007 ("Martin Br.") at 25). Martin argues that the charge of an

"unprovoked violent murder . . . undoubtedly produced some level of anxiety for the jurors" and

that "[a]gainst that backdrop, numerous jurors reported that they felt afraid from the presence of

[Martin's] family and supporters both inside and outside the courtroom." (Martin Br. at 25). He

also notes that most of the jurors reported that they overheard conversations about these

concerns. (Martin Br. at 25). Martin contends that the trial court's remedial steps simply

"confirmed and exacerbated" the jurors' fears that "action was warranted," (Martin Br. at 25-26),

and that "prejudice was demonstrated by the fact that none of the jurors could identify a single

reason for their fear," (Martin Br. at 26). The Appellate Division rejected this claim on the

merits, finding that the trial court's questioning of the jurors, the jurors' assurances that they

could remain impartial, arrangements for car service and lunch, as well as instructions given to

jurors individually and collectively to confine their deliberations to the evidence before them,

were appropriate and that "[u]nder these circumstances, [Martin's] motion for a mistrial was

properly denied." Martin, 54 A.D.3d at 776-77.

A trial judge is in "the best position to sense whether the jury is able to proceed properly

with its deliberations." United States v. Parker, 903 F.2d 91, 100 (2d Cir. 1990). Accordingly,

the judge is afforded "wide discretion to decide upon the appropriate course to take, in view of his personal observations of the jurors and parties," United States v. Aiello, 771 F.2d 621, 629 (2d Cir. 1985), abrogated on other grounds by Rutledge v. United States, 517 U.S. 292 (1996), and his determination can only be overturned by a finding of "manifest error," Patton v. Yount, 467 U.S. 1025, 1031 (1984). Indeed, a petitioner has the burden of showing the "actual existence of [prejudice] in the mind of the juror as will raise the presumption of partiality." Knapp v. Leonardo, 46 F.3d 170, 176 (2d Cir. 1995) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)); see Fama v. Comm'r. of Corr. Services, 235 F.3d 804, 813 (2d Cir. 2000) ("[O]n § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial.").

Significantly, "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillip, 455 U.S. 209, 217 (1982). The New York Court of Appeals has directed that when faced with a potentially compromising situation:

> the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Counsel should be permitted to participate if they desire. In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case. In this context, the court should carefully consider the juror's answers and demeanor to ascertain whether her state of mind will affect her deliberations. The trial court's reasons for its ruling should be placed on the record.

People v. Buford, 69 N.Y.2d 290, 299 (1987). The Supreme Court has observed that a trial court is properly entitled to "special deference" in this area because it is best situated to make a determination that "is essentially one of credibility, and therefore largely one of demeanor." Yount, 467 U.S. at 1038.

As noted, Justice Gerges immediately conducted a hearing to investigate the comments about juror fears. Contrary to Martin's claim that no juror "could identify a single reason for their fear," (Martin Br. at 26), the record shows that several jurors explained that seeing Martin's family and supporters during lunch breaks, in the elevator, and at the end of the day was the source of the discomfort. Justice Gerges thoroughly questioned each individual juror – in some cases, more than once – about his own and others' concerns, and inquired whether each could remain fair and impartial. All jurors answered in the affirmative, which the trial court found credible. Moreover, Justice Gerges took appropriate measures to allay the expressed concerns by arranging to have lunch brought in for the jurors and for cars to take them home. He also reminded them that they were to decide the case solely on the evidence.

Accordingly, this claim fails because Martin does not identify any actual juror bias and has not shown that the trial court's decision to deny his motion for a mistrial was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

### 2.    Post-trial CPL 330.30 Motion

Martin also made a post-trial motion to set aside the verdict based upon alleged juror misconduct. He claims that, in an abuse of discretion, "[n]ot only did the [trial] court fail to conduct a hearing, it did not even set forth a reason or basis upon which it denied [the] motion." (Martin Br. at 31). Martin argues that a hearing was appropriate based on an alternate juror's affidavit, which asserted "that jurors had discussed the case and their fear of [Martin's] family and supporters prior to deliberations, as well as after an instruction from the court to refrain from such behavior" and that "the verdict was affected by these discussions." (Martin Br. at 31). Martin claims that these "revelations were not known prior to rendition of the verdict." (Martin

11

Br. at 31). On appeal, the Appellate Division found that the trial court "properly denied, without a hearing," the CPL 330.30 motion. Martin, 54 A.D.3d at 777.

As a general matter, courts are properly reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) (quoting United States v. Sun Myung Moon, 718 F.2d 1210, 1234 (2d Cir. 1983)). The Second Circuit has emphasized that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." Id. For this reason, a post-verdict hearing regarding juror impartiality is required only when there is "clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." United States v. Sabhnani, 599 F.3d 215, 250 (2d Cir. 2010) (quoting United States v. Vitale, 459 F.3d 190, 197 (2d Cir. 2006)). Indeed, courts have properly denied a post-verdict hearing "even when jurors come forth with allegations of misconduct." Reynoso v. Artus, 722 F. Supp. 2d 394, 402 (S.D.N.Y. 2010) (citing United States v. Stewart, 590 F.3d 93, 133-34 (2d Cir. 2009)).

In this case, Justice Gerges conducted a thorough hearing at trial regarding the same issues raised in the CPL 330.30 motion. Contrary to Martin's assertions, the supporting affidavit he submitted did not contain significant revelations previously unknown to the court. Indeed, defense counsel conceded that he lacked "evidence to put forth in my affidavit or motion papers to indicate if there was actual impact that I can speak of." (S. 5). Having considered the oral arguments and papers, Justice Gerges explained that he based his decision upon "all the facts and the hearing that the court did hold with reference to this matter" at trial. (S. 6). It is also worth noting that as an alternate juror, the affiant was not actually present during deliberations.

12

Accordingly, this Court is not persuaded that the Appellate Division acted unreasonably or contrary to federal law in upholding the trial court's denial of Martin's post-verdict motion.

### 3. Arrest Photographs

Martin next argues that he was denied a fair trial because the trial court improperly admitted into evidence his arrest photographs. (Martin Br. at 33). Martin claims that these photographs unfairly bolstered the identifying witness's credibility, (Martin Br. at 34), and were "highly prejudicial" because "they depicted [him] in an exceptionally menacing manner . . . and left an impression on anyone who viewed them that [he] was to be feared," (Martin Br. at 33). The Appellate Division held that "[a]lthough there was no relevant purpose in admitting [the] arrest photographs into evidence, under the circumstances, the error was harmless, as there was overwhelming evidence of [Martin's] guilt, and no significant probability that the error contributed to his convictions." Martin, 54 A.D.3d at 777 (internal citations omitted).

As a general matter, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). To determine whether a state court's alleged evidentiary error deprived a petitioner of a fair trial, a federal habeas court must inquire not only "whether the trial court's evidentiary ruling was erroneous under state law," but also "whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." Reyes v. Ercole, No. 08-CV-4749 (JFB), 2010 WL 2243360, at *11 (E.D.N.Y. June 1, 2010) (citing Wade v. Mantello, 333 F.3d 51, 59-60 & n.7 (2d Cir. 2003)). In this case, even assuming that the admission of Martin's arrest photographs was erroneous under state law, as the Appellate Division noted, the error simply does not rise to the level of a constitutional violation. Indeed, it would not do so "unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice." Reyes, 2010 WL 2243360, at *10.

13

Martin fails to make such a showing here. Given the evidence and testimony offered at trial, Martin has not demonstrated that the photographs were "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without [them]." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) abrogated on other grounds by Perry v. New Hampshire, 132 S.Ct. 716 (2012). Accordingly, their admission, even in error, did not violate his right to a fair trial. See Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner can show that the error deprived [him] of a fundamentally fair trial.").

### 4. Summation Comments

In support of his claim that certain summation comments deprived him of a fair trial, Martin argues that the prosecutor "flagrantly appealed to the juror[s'] emotions" by noting that drug dealing is a dangerous business. (Martin Br. at 37). Martin also contends that the prosecutor improperly "bolstered the witnesses' credibility by pointing out that they feared for retribution from the community" for testifying, (Martin. Br. at 37), and that Wilson and Charles "were more believable given the manner of cross-examination they had to endure," (Martin Br. at 38). Martin claims that the prosecutor attempted to "denigrate the defense" by referring to defense counsel as "very slick" and "very experienced," (Martin Br. at 38), and by "misstating the defense arguments," (Martin Br. at 39). Martin further states that "the prosecutor improperly utilized [his] arrest photographs to assert that [he] had changed his appearance to avoid identification at trial." (Martin Br. at 39). The Appellate Division found that "[m]ost of the challenged remarks were fair comment on the evidence, permissible rhetorical comment, or responsive to defense counsel's summation," and that "[a]ny error resulting from the remaining challenged remarks was harmless." Martin, 54 A.D.3d at 777 (internal citations omitted).

14

In the context of a habeas petition, the Second Circuit has developed an exacting standard for overturning a conviction based on a prosecutor's remarks:

> A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding. In order to reach the level of a constitutional violation, a prosecutor's remarks must so infect the trial with unfairness as to make the resulting conviction a denial of due process. Prosecutorial misconduct during summation is grounds for reversal only when the remarks caused substantial prejudice to the defendant.

Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir.1991) (internal quotation marks and citations omitted). As this standard suggests, "it is not enough that the prosecutor['s] remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted).

Moreover, prosecutors typically "have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility." United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998). Defense counsel attacked the credibility of both Wilson and Charles, based on their lifestyle, criminal behavior, and whether "you [would] open the door" to one of them knocking at 3 a.m. (Tr. 656-59, 667). In response, the prosecutor asked the jury to consider motives the witnesses had for truthfulness, the reasons for several inconsistencies in their testimony (Tr. 685, 700-02), whether the two men were telling the truth, "lying," or "honestly mistaken," (Tr. 680, 686, 689-90). As to the photographs, defense counsel initially raised the issue during his own summation. (Tr. 665). See United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) ("Under the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal."). Furthermore, the trial court gave instructions to mitigate potential prejudice. (Tr. 681, 713, 735). The comments at issue, considered in the context of the proceeding as a whole, simply do not amount to a violation of Martin's federal rights.

15

### 5.   Weight of Evidence

Finally, Martin argues that the verdict was against the weight of the evidence because it "essentially relied" upon the testimony of two witnesses whose credibility was insufficient to establish Martin's guilt. (Martin Br. 42). The Appellate Division affirmed the verdict, noting that "[r]esolution of issues of credibility is primarily a matter to be determined by the jury, which saw and heard the witnesses, and its determination should be accorded great deference on appeal." Martin, 54 A.D.3d at 777-78. As an initial matter, Martin's "argument that [the] verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus." McKinnon v. Superintendent. Great Meadow Corr. Facility, 422 F. App'x 69, 75 (2d Cir. 2011); see 28 U.S.C. § 2254(a) (federal habeas corpus review permitted only where petitioner alleges violation of "the Constitution or a federal law or treaty"). The Court therefore is precluded from considering this claim.

Nevertheless, the Court will construe the pro se petition as asserting a sufficiency of evidence claim under the Fourteenth Amendment's Due Process Clause. See Brewster v. People, No. 08-CV-4480 (JFB), 2010 WL 317919, at *8 (E.D.N.Y. Jan. 21, 2010) (citing Einaugler v. Supreme Court of the State of New York, 109 F.3d 836, 839 (2d Cir. 1997)). It is well settled that a habeas petitioner challenging the legal sufficiency of a state court criminal conviction "bears a very heavy burden." Fama, 235 F.3d at 811. The Second Circuit has made clear that in a case such as this, "where the state court[] ha[s] denied a claim of insufficient evidence on the merits, we may not grant the writ unless we conclude that no reasonable court could have held that any reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." Garbutt v. Conway, 668 F.3d 79, 81-82 (2d Cir. 2012); see Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making this determination, a habeas court "must defer to the jury's assessment of the credibility of witnesses." Taylor v. Napoli, No. 09-CV-2511

16

(NGG), 2011 WL 3648228, at *6 (E.D.N.Y. Aug. 16, 2011) (citing Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996)).

A federal court evaluating a sufficiency of evidence claim "must look to state law to define the elements of the crime." James v. Marshall, No. CV-05-1992 (BMC), 2007 WL 3232513, at *14 (E.D.N.Y. Oct. 31, 2007) (citing Jackson, 443 U.S. at 324). Under New York law, a person is guilty of murder in the second degree when he intentionally causes the death of another person. N.Y. Penal Law § 125.25[1]. A person is guilty of menacing in the second degree when he intentionally places another person in reasonable fear of physical injury by displaying a deadly weapon. N.Y. Penal Law § 120.14[1]. It is worth noting that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983). Moreover, although Martin emphasizes the lack of physical evidence connecting him to the crimes, "a conviction may be based upon circumstantial evidence and inferences based upon the evidence." United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993).

In this case, prosecutors offered substantial testamentary evidence. Eyewitness Charles testified that had a "close" relationship with Phillip, the victim, (Tr. 310), and had known Martin for two years, (Tr. 319). Charles stated that on the night of the shooting he recognized Martin's car drive by, (Tr. 318-319), and a few minutes later saw Martin walk down the street and look into Phillip's car. (Tr. 321-22). Martin then saw Charles and asked him where Phillip was and who was inside with him. (Tr. 323). Charles described Martin's clothing and noted that he "[k]ept his hand within the pocket of the hoody that he had on." (Tr. 324). Charles testified that he watched from down the block as Martin suddenly fired a shot at Phillip, causing him to cry out and grab his left leg, and then fired five more times. (Tr. 330-31). Charles went to assist Phillip as soon as Martin walked away, but then Martin returned and fired another shot at Phillip.

17

(Tr. 332-34). According to the medical examiner, Phillip suffered five gunshot wounds, including one to the left thigh. (Tr. 509). Additionally, Wilson – who knew Martin for more than twenty years – testified that Martin approached him a month or so after the shooting to ask for "money and . . . to help him organize a place to rest," saying "right now I got problems, I'm hot." (Tr. 238). Wilson stated that when he refused to help, Martin "[w]hipped out a gun and point[ed] it at me," (Tr. 241), saying "I'll hit you some like Corey [Phillip]," (Tr. 243).

Viewing "the evidence in the light most favorable to the prosecution," the Court finds that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" in this case. Jackson, 443 U.S. at 319. Martin's petition therefore fails with regard to this claim.

III.    CONCLUSION

For the reasons set forth above, Martin's petition for a writ of habeas corpus is denied. The Court declines to issue a certificate of appealability because the petitioner has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: January 31, 2013
       Brooklyn, New York

18